Mount Vernon Hebrew Camps Incorporated *v.* Wayne County Commissioners, Appellants.

Argued March 5, 1963.   Before RHODES, P. J., ER-
VIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and
FLOOD, JJ.

*David M. Boyd,* County Solicitor, for appellants.

*Emanuel Schwartz,* with him *Leonard J. Rosenfeld,* of the New York Bar, and *John J. Koehler,* for appellee.

OPINION BY FLOOD, J., April 18, 1963:

This is an appeal from a decree exempting Mount Vernon Hebrew Camps Incorporated from taxation upon its real estate in Wayne County, which it operates as a children's camp in the summer months. The question before us is whether the appellee is an institution "of purely public charity" "maintained by public or private charity", so as to qualify it for such exemption under art. IX, §1, of the Constitution and §202 of the Act of 1943, P. L. 571, 72 PS §5453.202.

The appellee was organized as a non-profit corporation under the laws of the State of New York for the charitable purpose of establishing one or more camps for boys and girls, young men and women, residents of the City of Mount Vernon, New York, "and others", to promote interest in camping and other lawful sports and to provide social and athletic recreation for young people to improve health and to promote friendship, sociability and culture among its members. The corporation is a charitable organization under the laws of New York, being an arm of the Young Men's and Young Women's Hebrew Association of Mount Vernon, New York, Incorporated, in the performance of the latter's charitable and educational functions, and "basically" it seeks to further the charitable, cultural and educational functions of that association. The association receives at least one-half of the funds for its operations from the public charitable organizations, to wit, Federation of Jewish Philanthropies (33%), Mount Vernon Community Chest (8%), and various community efforts (8%).

It provides small group experience, develops social skills and accepts referrals from social case work agencies, foster home placements, etc. It accepts physically handicapped and emotionally disturbed children for aid and employs trained social workers and psychologists to aid them and makes referrals to counselling services on the basis of the experience with such children during the summer months. Enrollment in the camp is open to all children regardless of race, creed or color, and while the majority attending the camp are from the Jewish community in and around Mount Vernon, New York, about eight to ten percent of the campers are Christian children. "Primarily" all the children come from the Westchester County, New York, area.

All the directors in the camp are volunteers. None of the corporation's officers or directors receive any salary or compensation or other money benefits from it.

The corporation is exempt from income tax by action of the United States Treasury Department, and is exempt from unemployment compensation tax, franchise, corporate net income and loan taxes, as well as sales and use taxes under the laws of the Commonwealth of Pennsylvania. It receives a subsidy as a charitable social service organization from the State of New York in the form of cash reimbursement for moneys spent for milk and receives surplus foods from the United States Government on a per capita basis.

The majority of its receipts come from fees paid by parents or other sponsors for the children at the camp for the summer. The fee for the nine week camp season is approximately $460 but not all campers pay the regular fee. Some pay no fee and others pay a partial fee as a result of scholarships granted to them.

The majority of its assets are in the form of real estate and buildings used as a summer camp. The funds

for the purchase of the real estate and buildings were obtained by means of a public fund raising campaign throughout the community, together with a contribution of $25,000 from the Henry Kaufman Foundation. Approximately $10,000 cash is set aside as a reserve fund for the construction of a sewage system at the camp.

The above facts were submitted to the court as an agreed statement, to which was attached a "Statement of Operations" for the fiscal year ending September 20, 1960, showing total receipts from camp operations of $106,249. Of this amount, $100,767 came from fees paid by campers, $1,119 from campers' transportation, less expenses, $104 from canteen sales, less expenses, and $2,-824 from canteen gratuities. The only item of receipts which appears to be a public or private gift is the New York State milk expense subsidy of $1,306. The operating expenses for the year were $96,462, leaving an operating profit of $9,786. From the operating profit, reserves of $3,000 were set aside for building and equipment and $5,000 for a sewage system, leaving a "net profit after all charges" from camp operation of $1,786.

If the milk subsidy is eliminated from the receipts, there still remains a net profit after all charges and reserves of $480. The statement also shows interest received of $517 and net proceeds of a sewer fund dinner of $6,322. These proceeds were transferred to the reserve for sewer construction.

While it is clear that the camp is not operated for the profit of any individual it is equally clear that it is not a purely public charity as that phrase has been defined in our cases, the latest of which is *Woods Schools Tax Exemption Case,* 406 Pa. 579, 178 A. 2d 600 (1962). In that case the Supreme Court said: "For the appellant to obtain the claimed exemption from taxation, it must affirmatively show that the entire institution, (1) is one of 'purely public charity'; (2) was

founded by public or private charity; (3) is maintained by public or private charity", ibid., at p. 584, 178 A. 2d at p. 602. It held that *Woods Schools* was not entitled to an exemption because it had not met the burden of establishing the first or third of these propositions.

The crucial issue here is whether the children who go to the appellant's camp pay the cost of the maintenance of the camp. If all of them, or substantially all of them, pay their way, the appellant may not receive an exemption. In the *Woods Schools* case, supra, where scholarship deductions were distributed among only two percent of those enrolled and the total amount given in partial scholarships amounted to less than two percent of the total tuition income, the school was denied exemption. In *Ogontz School Tax Exemption Case*, 361 Pa. 284, 65 A. 2d 150 (1949) no exemption was granted although "what is equivalent to free board, lodging and instruction" was furnished "to about ten percent of its students".

The appellee seeks to distinguish these cases by reason of the facts (1) that the appellee receives a cash subsidy from the State of New York for purchases of milk, receives free surplus food from the United States Government and receives contributions from charitable organizations and from individuals to its scholarship funds, (2) that "not all" the campers pay the regular rate, some having full scholarships and others having partial scholarships, and (3) that the statement of operations, while it shows a profit from operations, includes no reserve for depreciation of buildings and equipment and no accumulation to enable the appellee to make "the major capital improvements contemplated by the Legislature in §202 of the statutes".

The difficulty with the appellee's position is that it has the burden of proof and has presented its case upon an agreed statement of facts which does not sus-

tain the burden. The subsidy received from the State of New York comprises no substantial part of the cost of operation of the camp and if it were eliminated the camp would still operate at a profit. There is no indication of the amount of surplus food received from the United States Government or what proportion of the total cost of operation it represents. There is nothing in the agreed statement as to the cost of the buildings and equipment or whether the reserves set aside from current receipts from fees and other expenditures of campers are sufficient to keep the buildings and equipment in repair or improve them. Finally there is no evidence whatever as to how many of the campers pay less than the cost of what they receive. The statement that "not all campers pay the regular fee; some pay no fee while others pay a partial fee, all as a result of the scholarships granted to them", without showing the proportion of the campers who do not pay full cost, or the proportion of the cost paid by them, furnishes no basis for determining whether the criterion set up in the *Ogontz* and *Woods Schools* cases has been met here. The statement that "the majority of receipts of the appellant comes from fees paid by the parents or other sponsors paying for the children at the camp in the summer" certainly gives no basis for allowing an exemption, in the absence of more specific facts. Who the sponsors are who make individual donations for the benefit of some of the campers, whether they are relatives and friends of the campers or charitably disposed persons with no personal relation to them, how many sponsors there are, how many children reap the benefit of these donations, nowhere appears.

On the face of the agreed statement, fees and other amounts received from campers are sufficient to pay all expenses of operation and set up a reserve of $3,-000 for building and equipment and of $5,000 for a sewage system. We thus have presumably a $3,000

reserve for depreciation and a $5,000 reserve for improvements out of the operating profit of the camp, with a slight surplus in addition. Whether $3,000 is a sufficient reserve for depreciation or $5,000 is a proper and sufficient accumulation for improvements there is no way of telling under the facts submitted to the court.

The plaintiff has completely failed in sustaining its burden of proof. A full disclosure and a specific showing that the camp is maintained by public or private charity is requisite for an exemption. The general statements contained in this record will not do.

Decree reversed.